GEORGE A. LOWELL, and others, in equity,

*vs.*

WASHINGTON COUNTY RAILROAD COMPANY, and others.

Washington.     Opinion March 8, 1897.

</div>

*Railroads. Location. Statutes. Guaranty. Alteration of Contract. R. S., c. 51, § 6; Stat. 1893, c. 193; Spec. Laws, 1895, c. 90, 91.*

The statute of 1893, c. 193, confers the same authority upon chartered roads to make changes in their location that was previously conferred upon roads organized under the general railroad law. *Held;* that the change of location in this case was authorized by law.

When a later act, extending the time for the location and construction of a railroad, identifies the corporation, eo nomine, but through error recites a wrong chapter as being the act of incorporation, *held;* that the later act applies to the railroad therein named, notwithstanding the mistaken number of the chapter.

By special act of 1895, c. 91, the county commissioners were authorized to pass upon the sufficiency of the guaranty given by contractors for the faithful performance of their contract to build a railroad. *Held;* that the commissioners acted judicially in approving the bond, and that their decision is final; also, that the court has no authority in the absence of fraud to revise their judgment.

By an act of the Legislature the county of Washington was authorized to subscribe for and take preferred stock in the Washington County Railroad. The charter of the railroad gave its termini as "some point on the Saint Croix river in the city of Calais or vicinity" and "some point on the Maine Central Railroad in Hancock county." There was no other direction or limitation upon its location, other than it must "pass through the counties of Washington and Hancock by such route as the directors may select." When the vote to take the preferred stock was had, no location of the railroad had been made. *Held;* that the location might be anywhere, between the two termini, through the two counties; and that the directors had full and absolute control as to the line of location.

*Held;* that the change in the location in this case, as approved by the railroad commissioners, did not release the county from its liability under its original subscription for stock; and that a second subscription for stock was unnecessary.

*Also;* while a radical, fundamental change in the character of an original enterprise releases the subscriber for stock who does not consent to it, it does not have that effect if consented to. In this case it appears that the county consented to the changed location, as shown by their re-subscription for stock; and there being nothing in the vote of the county to the contrary, the county commissioners had authority to give consent.

Upon an objection that work done in grading before January 1, 1896, was done before location of the line which might be located elsewhere, and therefore cannot be treated as work done upon the road within the terms of the special act of 1895, c. 91, *held;* that it was known from preliminary surveys where the line would be at that point, and the actual location subsequently made coincides identically with the grading done. These facts must be regarded as a substantial compliance with the statute limitation of time within which the work of construction should be commenced.

On Report.

Bill in equity, heard on bill, answers and testimony.

The case appears in the opinion.

*C. P. Stetson, G. M. Hanson and F. B. Livingston,* for plaintiffs.

Jurisdiction:—R. S., c. 77, § 6; 2 Dillon, Mun. Corp. §§ 916–919; 1 Wood, R. R., 131; Adams, Eq. 212; *Crampton* v. *Zabriskie,* 101 U. S. 601; *English* v. *Smock,* 34 Ind. 36, (7 Am. Rep. 215).

Municipal Aid:—1 Dillon, Mun. Corp. § 153; 23 Am. & Eng. Ency. 396; *Bucksport* v. *Brewer,* 67 Maine, 295; *Daveiss County* v. *Dickinson,* 117 U. S., 657–663, 665; *People* v. *Smith,* 75 N. Y. 772, 781.

Second subscription of no effect:—*State* v. *Kinnon,* 7 Ohio St. 562; *Sheboygan County* v. *Parker,* 3 Wall. 93, 96; *Machias River Co.* v. *Pope,* 35 Maine, 17; *Young* v. *Clarendon Township,* 132 U. S. 347, 348; *Danville* v. *R. R. Co.,* 43 Vt. p. 155; 1 Wood, Railroads, 339.

Section 6, act of 1895, a condition precedent:—Entire line to be under contract, with a satisfactory guarantee, and second subscription beyond authority. *Keyes* v. *Westford,* 17 Pick. 273, 279.

Change of location avoids subscription:—*Middlesex, etc., Co.* v. *Locke,* 8 Mass. 268; *Same* v. *Swan,* 10 Mass. 384; *Manning* v. *Matthews,* 66 Iowa, 675; 1 Wood, R. R. § 119; 2 Id. § 271; *Ashtabula, etc., Co.* v. *Smith,* 15 Ohio St. 328.

Change in the line was a violation of the contract, and that courts have uniformly interfered to give relief, is well sustained. *Wullenwaher* v. *Dunnigan,* Neb. 47 N. W. R. 420; *Virginia, etc., R. R. Co.* v. *Lyon Co.,* 6 Nev. 68; *Aurora* v. *West,* 22 Ind. 88; *Purdy* v. *Lansing,* 128 U. S. 557; *State* v. *City of Morristown,* 24 S. W. R. 13; *Platteville* v. *Galena,* 43 Wis. 493.

No power of R. R. Comrs. to change location: *State* v. *Cleland,* 68 Maine, 258.

Extension:—Act of 1895, c. 90 is without sense.

Charter subject to R. S., c. 51, § 6: Compliance a condition precedent. *Verona's Appeal,* 108 Pa. St. 83; *Hoyt* v. *Ea. Saginaw,* 19 Mich. 39; 23 Am. & Eng. Ency. p. 454, 467, 468, and cases; *Mizell* v. *Burnett,* 4 Jones' Law, 249, (69 Am. Dec. 744); *Com.* v. *E. & N. E. R. R. Co.,* 27 Pa. St. 339, (62 Am. Dec. 372); *Brewster* v. *Hartley,* 37 Cal. 15; *Martin* v. *Pens. etc., R. R. Co.,* 8 Fla. 370, (73 Am. Dec. 713); *Cent. Transp. Co.,* v. *Pull. Pal. Car Co.,* 139 U. S. 24; *Dugan* v. *Bridge Co.,* 27 Pa. St. 303, (67 Am. Dec. 464.) Bond given not a sufficient guarantee.

*C. E. and A. S. Littlefield; B. D. and H. M. Verrill,* for defendants.

Rules for construing the acts of the legislature: The end sought was the completion of the proposed railroad. *Donnell* v. *Joy,* 85 Maine, 118; *Chamberlain* v. *Painesville, etc. R. R. Co.,* 15 Ohio St. 244, cited by plaintiffs and approved by the court in *Ashtabula, etc., R. R. Co.* v. *Smith,* 15 Ohio St. 328, also cited by the plaintiffs; 1 Wood, Railroads, p. 14, how to build a railroad, or to accomplish the purposes of the legislature, and not how to defeat the building of a railroad; *Collins* v. *Chase,* 71 Maine, 434.

In *Danville* v. *R. R. Co.,* 43 Vt. 155, there was clearly a radical change in the original subscription, upon different terms and conditions. In *State* v. *Kennon,* 7 Ohio St. 562, the court

held that the officers were officials, and that they were to exercise political functions, and were not in any sense agents for a single specific purpose. In *Sheboygan Co.* v. *Parker*, 3 Wall. 93, 96, the court held that the legislature had the power to constitute persons agent for a specific purpose. In *Young* v. *Clarendon Township*, 132 U. S. 347, 348, the governor refused his certificate, and the court held that, under such circumstances, the bonds never became the valid obligation of the town. In *Machias River Co.* v. *Pope*, 35 Maine 17, the court merely held that the fact that the county commissioners had not made their decisions as auditors a matter of record did not invalidate their action as auditors. What their rights and powers would have been when acting for the county as officials for the county, is not raised or suggested by that case. If the Vermont authorities are to govern, the commissioners were acting officially and did not exhaust their authority, by making the first subscription. *First National Bank* v. *Town of Concord*, 50 Vt. 258, approved in *First National Bank* v. *Arlington*, 15 Blatch. 57; 1 Wood, Railroads, 339; *Keyes* v. *Westford*, 17 Pick. 279, is in no sense parallel. Two of the committee agreed with a third member to construct the road in a more expensive manner than that provided for in the laying out. The court say : "The act of the committee, therefore, in making provision for a more complete and expensive road, was, so far, an excess of authority; and it follows as a necessary consequence, that the contract with Bunker to make the deficiency of the first contract was founded in a like excess of authority, and therefore imposed no obligation on the town."

The statute defines the duties of the county commissioners, and among other things it requires them to "represent it; have the care of its property and management of its business; by an order recorded, appoint an agent to convey real estate; lay out, alter or discontinue ways, and perform all other legal duties." R. S., c. 78, § 12.

Change of location:—*Middlesex Turn. Corp.* v. *Locke*, 8 Mass. 268, is overruled in *Agricultural Branch R. R. Co.* v. *Winchester*, 13 Allen, 32, sustained by *Meadow Dam Co.* v. *Gray*, 30 Maine,

547. It must appear that the change in location was made without the assent of the subscriber. 2, Wood, Railroads, p. 1108, recognizes the right to change the location before construction. The subscribers are presumed to have known the law which authorized a change in the location and to have contracted in view of it. *Meadow Dam Co.* v. *Gray,* supra.

Railroad commissioners authorized to approve change of location: —*State* v. *Chadbourne,* 74 Maine, 506; *Me. Cent. R. R. Co.* v. *Waterville, etc., Co.,* 89 Maine, 328. ·

Actual construction before January 1, 1896 :—*Manchester, etc., R. R.* v. *Keene,* 62 N. H. 81. A substantial compliance with the conditions of the resolution is sufficient. *People* v. *Holden,* 82 Ill. 93; *Courtright* v. *Deeds,* 37 Iowa, 503; *Ogden* v. *Kirby,* 79 Ill. 555; *Ashtabula, etc., R. R. Co.* v. *Smith,* supra; *C. M. & St. P. Ry. Co.* v. *Shea,* 67 Iowa, 728; *Cantillon* v. *Dubuque & N. W. Ry. Co.,* 78 Iowa, 48; *Smith* v. *Allison,* 23 Ind. 366.

There must be a fair and substantial compliance with the terms of the contract, and this is all that is required. *Missouri Pacific Ry. Co.* v. *Tygard,* 84 · Missouri, 263, (54 Am. Rep. 97); 1 Wood, Railroads, p. 352; *Wemple* v. *St. Louis J. & S. R. Co.,* 120 Ill. 196.

Bond a sufficient guarantee:—*Andrews* v. *King,* 77 Maine, 238; *State* v. *Dunnington,* 12 Md. 340; *Noble* v. *Union River Logging R. Co.,* 147 U. S. 125; *Brewer* v. *Boston, etc., R. R. Co.,* 113 Mass. 57; High, Legal Remedies, §§ 150 and 154.

SITTING: PETERS, C. J., WALTON, FOSTER, HASKELL, WHITE-HOUSE, STROUT, JJ.

STROUT, J. Fifteen tax payers, in the county of Washington, seek by this bill to restrain the county commissioners and county treasurer of Washington county from any further payment to the Washington County Railroad Company, upon the county's subscription for $500,000 of the preferred stock of the railroad company. The complainants claim upon several grounds that the county has been released from all liability.

The Washington County Railroad Company was incorporated by the legislature in 1893. Chap. 454 of special laws. The second section of the charter provided that "said corporation shall have the right to locate, construct, equip, maintain and operate, or lease a railroad from some point on the Saint Croix River, in the city of Calais, or vicinity, through the counties of Washington and Hancock, by such route as the directors of said corporation may select, subject however to all provisions of the revised statutes, chapter fifty-one, section six, to some point on the Maine Central Railroad in Hancock county, including a branch to Eastport, and to consolidate with any railroad company in the State of Maine, or in the Province of New Brunswick, with which it may connect." Section 7 of the charter provided that the charter should become void, "unless the railroad between Calais and some point on the Maine Central Railroad as aforesaid, shall have been located and the construction thereof commenced by the first day of February," 1895, "and the railroad completed for travel between said termini by the first day of February," 1899, "except as to such part thereof as may then have been completed." By Chap. 90 of the special laws of 1895 "the time for the location and construction of the Washington County Railroad Company, incorporated under chapter fifty-four of the private acts of eighteen hundred and ninety-three, is hereby extended to four years from the date of the approval of this act, and all the provisions of said chapter shall be and remain in force during said four years." This act was approved February 28, 1895.

It will be noticed that the act of 1895 refers to the original charter, as chapter 54—when it should have been 454. Chapter 54 was an act in regard to larceny. But the act extends the time for the construction of the "Washington County Railroad Company" incorporated in 1893. The only act of incorporation of the Washington County Railroad Company in that year was by chapter 454. The latter act identifies the railroad, *eo nomine*, and it would be puerile to hold, that, because of the mistaken number of the chapter, the later act did not apply to the original charter of 1893. *Woodworth* v. *Grenier*, 70 Maine, 242. By chapter 91 of

the special laws of 1895 the county of Washington was authorized to aid in the construction of the railroad "by subscribing for and purchasing preferred stock of the Washington County Railroad Company to an amount not to exceed five hundred thousand dollars in all." Full provision was made in the act for submitting to the voters of the county the question whether the county should so subscribe. It is admitted that all the provisions of this act were complied with to validate a favorable vote—and that by an overwhelming vote, on the 29th of July, 1895, the voters of Washington county authorized a subscription of $500,000 to the preferred stock of the railroad. Section 6 of the act provided that if the county authorized the subscription, then "when the entire line shall be under contract and a satisfactory guarantee is given to the county commissioners, that the line shall be completed under said contract, then said commissioners shall cause subscription to be made in behalf of said county for preferred stock" to the amount authorized. The act also provided, section 7, that unless the location of the railroad "through Washington county from the west line thereof to the Saint Croix River" should be filed with the county commissioners on or before October first, 1899, "accompanied by the affidavit of the majority of the directors of said company, that they intend in good faith to proceed" with construction, "and shall have begun the work of actual construction of said line within said county on or before the first day of January, eighteen hundred and ninety-six, then if either of said conditions fail," all the provisions of the act relating to the railroad "shall become null and void, and said company shall thereby forfeit all rights herein conferred or granted" by the county of Washington.

It will be noticed that the charter of the railroad gives its termini as "some point on the Saint Croix River in the city of Calais or vicinity" and "some point on the Maine Central Railroad in Hancock county." There is no other direction or limitation upon its location, other than it must "pass through the counties of Washington and Hancock by such route as the directors may select."

When the vote to take preferred stock was had, no location of

the railroad had been made. It might be anywhere, between the termini, through the two counties. The directors had full and absolute control as to the line of location. The length of the road exceeds one hundred miles. It is evident from the latitude given in the charter, that the legislature contemplated a road which should afford to Washington county an outlet to the Maine Cenral, and by it to the sea, shorter and more convenient than any existing land communication, and thus largely develop the resources of Washington county in particular and the state generally. It designedly left to the practical judgment of the directors the selection of the most feasible route, reference being had to the expense of construction, the possibility of obtaining the necessary funds; and all other considerations that would affect or control the choice of route. When the question was submitted to the voters of the county, they knew that no location had been made, and that the directors of the road alone were authorized to make such selection of route as they might deem wise—limited only to the two termini—and between them to pass through Washington and Hancock counties. It is claimed by complainants that when the matter was submitted to the people, it was understood or represented, that the location would be from Calais, down the margin of the Saint Croix to Red Beach, and thence on to Dennysville. It is sufficient to say that the case fails to disclose any evidence of such representation or understanding. And if it had it would have made no difference, as the place of location was intrusted to the discretion of the directors as necessity might require, and they might judge expedient.

The vote of the county having been canvassed and declared by the county commissioners and properly recorded on August 15, 1895, the railroad company on September 5, 1895, made a contract with George P. Wescott and James Mitchell by which the entire line was to be constructed by the contractors for a price stipulated therein. Although the line had not then been located, the contract bound the contractors to build between the termini, through Washington and Hancock counties, wherever it might be located by the directors. They also bound themselves to conform

to the charter and the act authorizing the county of Washington to aid the road. The contractors on the thirteenth day of September, 1895, gave a bond with sureties to the county commissioners of Washington county in the sum of one hundred thousand dollars, for the faithful performance of their contract to build the railroad. This bond was approved by the county commissioners, in accordance with section 6 of chapter 91, special laws of 1895. The statute conferred upon the county commissioners authority to pass upon the sufficiency of the guarantee. In doing this they acted judicially, and their decision was final. We have no authority in the absence of fraud to revise their judgment. *Walton* v. *Greenwood*, 60 Maine, 356–368; R. S., c. 78, § 10; *Brewer* v. *Railroad*, 113 Mass. 56; *English* v. *Smock*, 34 Ind. 36, (7 Am. Rep. 215); *State* v. *Dunnington*, 12 Md., 340. These acts constituted a full compliance with the conditions precedent, required by § 6 of c. 91, special laws of 1895, and the county commissioners were then authorized to subscribe for $500,000 of the preferred stock of the railroad company, which they did on September 21, 1895.

To hold their rights under this subscription, as provided in § 7 of ch. 91, special laws of 1895, it was necessary that the work of actual construction of the road within the county of Washington should have been begun on or before January 1st, 1896. The bill alleges "that work was begun on said railroad about October 1st, 1895, and continued by said contractors (Wescott and Mitchell) in the towns of Machias and Jonesboro" upon which the county commissioners paid to the railroad company over twenty-two thousand dollars, in accordance with § 6 of c. 91, which required a pro rata payment by the county upon its stock, when the company " shall have graded any section of five miles of its line." At this time the line had not been actually and finally located, but it was known where the line would be, at the place of this work, and the subsequent location in fact is identical with it. The evidence shows that about seven miles of the road had been graded by Wescott and Mitchell under their contract prior to January 1st, 1896—and that prior to that time the contractors had expended in the grading and right of way over forty-five thousand dollars and

incurred liabilities in addition of over three thousand dollars—
these sums included twenty-five thousand dollars paid J. N. Greene
in accordance with § 4 of c. 90, special laws of 1895. It is in
evidence that about fifteen miles of road in all within the county
of Washington had been graded at the time of filing this bill.

The rights of the parties had now become fixed, and if the con-
tractors had proceeded with the construction of the road, the
corporation would have been entitled to receive and the county
bound to pay under its subscription, for every section of five miles
graded, the pro rata amount provided for in § 6 of c. 91. The
contract of Wescott and Mitchell described the line, as running
through Robbinston, Perry and Pembroke to Dennysville, although
no actual location had then been made by the directors. They
undoubtedly contemplated locating it through those towns, and in
March, 1896, the directors did regularly locate the line through
those towns to Dennysville, and from thence to the Maine Central,
which location was duly approved by the railroad commissioners.

Meantime Wescott, one of the contractors to construct the road,
becoming sick, utterly refused to proceed under the contract. The
railroad company then had the right, by suit to recover damages
for breach of the contract, and the county commissioners could
have resorted to a suit upon their bond. But all parties desired
the road to be built. These suits would not have accomplished
that result. In this dilemma, the railroad company made a new
contract for the construction with James Mitchell for the same
cost, and practically upon the same terms and conditions; who
gave a bond to the county commissioners, with sureties satisfactory
to and approved by them, for the performance of his contract; and
this substituted contract and guarantee was accepted by the county
commissioners in lieu of the first contract and guarantee. Under
the new contract and guarantee the county commissioners and the
railroad company had reason to believe that the actual building of
the road was assured. It could make no difference to the county
by whom the work of construction was done if the cost was not
increased. The important and greatly desired object was to have
the road built.

It was not necessary, nor could it be expected, in a great enterprise like this, involving a cost of over two millions of dollars, that the railroad company, when commencing work, should be in possession or have in control, the entire amount of funds, necessary to complete the work, as claimed by complainants. If such had been the rule, few railroads would have been built. With the five hundred thousand dollars from the county, and such subscriptions as could be obtained along the line of the road, it might well be assumed that sufficient bonds of the road could be floated, as the funds were needed, to complete it.

Complainants earnestly contend that this change of contract and guarantee was unauthorized, and released the county from its subscription. The objection does not impress us as valid. On the contrary, under the circumstances of the case, the directors acted wisely in making a new contract to insure the construction of the road instead of resorting to a suit for damages, under the contract. The commissioners would have encountered the same practical difficulty in a suit upon the original bond.

Before any work was done upon that portion of the line between Calais and Dennysville, the directors found that the great cost of grading this road through Robbinston and Perry, endangered the success of the enterprise, and that a route from the Saint Croix in Calais through Baring and Charlotte to Dennysville could be graded at a saving of at least one hundred thousand dollars, without increasing the distance, or lessening the usefulness of the road as a through line to the Maine Central. They therefore deemed it wise, for the interest of the railroad, the county and the state to change the location through Robbinston to one through Baring and thence to Dennysville,—a distance of about twenty miles,—no change of location from Dennysville to the Maine Central, a distance of about eighty miles was contemplated or made. Accordingly the directors abandoned the former location from Calais to Dennysville, and located a new line to Dennysville, through Baring and Charlotte. This location commenced at the Saint Croix and Penobscot Railroad in Calais, on the bank of the Saint Croix River at a point about five miles westerly of the eastern

terminus of the Saint Croix and Penobscot Railroad, thence through Baring and Charlotte to Dennysville. From the point begun at it was proposed to pass over the Saint Croix and Penobscot Railroad to a station in the populous part of Calais almost identical with that established by the original location. The first location begun at or near the southern terminus of the Saint Croix road. Mitchell, the contractor, controls the Saint Croix and Penobscot, and the charter of the Washington County Railroad authorized consolidation with other railroads. The utilizing of the Saint Croix road saved the building of about three miles of new road. This location was duly approved by the railroad commissioners on July 11, 1896, and by the county commissioners on July 28, 1896. This was a substantial compliance with the charter. *People* v. *Holden*, 82 Ill. 93. Since which time about eight miles had been graded upon this new location, before the filing of the bill.

It is strenuously urged by the complainants that the change was unauthorized—that when the first location had been made and approved, that the delegation to the railroad company of the right of eminent domain, under the charter, had been exhausted; and that if the railroad shall be constructed upon this line under purchase of the right of way, it is such a deviation as absolves the county from liability under its subscription to stock.

It is true, that in many cases, the exercise of a granted power is once for all. But aside from statute, the better opinion now is, as to railroads, that the exercise of the right of eminent domain is not exhausted by the first location. Railroads are of great utility to the business of a community. They generally attract population and new industries along their line, and to meet the necessities thus produced, and to afford greater service to the people, it becomes necessary, from time to time to have enlarged terminal facilities, new stations, sidings, etc. These needs cannot always be foreseen —and if they could, it might be difficult or impossible to raise sufficient funds to provide for these future demands at the inception of the enterprise; and accordingly it is now held that the right of eminent domain continues in the corporation, unless

limited in its charter, to meet these necessities. Elliot on Railroads, § 962. Randolph on Eminent Domain, § 116. *Railroad* v. *Williams*, 54 Pa. St. 107; *Hagner* v. *Railroad*, 154 Pa. St. 478; *Railroad* v. *Daniels*, 16 Ohio State 396; *Prather* v. *Railroad*, 52 Ind. 42; *Chicago Railroad* v. *Wilson*, 17 Ill. 123; *Peck* v. *Railroad*, 101 Ind. 366.

This court has held that a railroad company cannot condemn land *for an extension of its road*, after the time limited in its charter for completing the road. *Peavey* v. *Calais R.* 30 Maine, 501. But this doctrine is not inconsistent with the right of a railroad company to condemn land for necessary stations and sidings as the necessity therefor may arise. But the matter is regulated in this state by statute. Revised Statutes, c. 51, § 6, relating to railroad corporations created under the general law, provide that the location of the route shall be presented to the railroad commissioners, and also filed with the county commissioners, and if the railroad commissioners approve the location, and determine that public convenience requires it, the corporation may proceed with the construction, "but the location so filed shall not vary, except to avoid expense of construction, from the route first presented to said board of commissioners unless said variation is approved by them." This section is made a part of the charter of the Washington County Railroad. Under it, it is obvious that a variation from the original location, to avoid expense of construction, which is this case, could be made, subject to the approval of the railroad commissioners. As this section applied only to corporations created under the general law, unless specially referred to in the charter, and as many if not most of the large roads existed under special charter, the legislature in 1893, by c. 193, authorized any railroad corporation, under the direction of the railroad commissioners, to make any changes in the location deemed necessary or expedient, and for this purpose they were authorized to purchase, or condemn lands under the right of eminent domain. While this statute is not in terms an amendment of § 6 of c. 51, it relates to the same subject matter, and being in pari materia should be construed with it. *Collins* v. *Chase*, 71 Maine, 434. It confers

the same authority upon chartered roads that was previously conferred upon roads organized under the general law. It was intended to cure a defect in the statute. It enlarges the rights of railroads existing by charter. No reason is perceived why its benefits should not be shared by the Washington County Railroad. The reference to section 6 in the charter should not be construed to exclude this general law. *State* v. *Chadbourne,* 74 Maine, 508. The case of *State* v. *Cleland,* 68 Maine, 258, was of a specific grant, acting upon a particular thing, inuring to the benefit of a single individual. A subsequent general act upon the same subject matter, and affecting the right of persons generally, was properly held not to repeal or modify the first act. But this principle does not .apply in this case. The same may be said of *County of Cass* v. *Gillett,* 100 U. S. 585.

It follows that the change in the location, as approved by the railroad commissioners, was authorized by law. All the provisions of law were complied with which were necessary to render it valid.

Such change did not release the county from its liability under its original subscription for stock. The second subscription was unnecessary. It was made from abundant caution, but it did not change or invalidate the first and original subscription. At most, it was a substitution of a subscription for one already in force, upon which the county commissioners took a guarantee to secure the building of the road under the new contract, and was within the power of the county commissioners, and binding upon the county. It neither enlarged nor changed the liability which the county by its votes authorized its commissioners to assume for it. It was not a new execution of a power once completely executed, but a re-affirmance of a former act, done by consent of parties, with full authority from the county.

It must be remembered that the charter was for a road from the Saint Croix, at or near Calais, through Washington and Hancock counties, to a junction with the Maine Central upon such line as the directors should determine. The vote of the county was to take stock in a road to be built under this general charter. No condi-

tions were affixed to the vote, and none can be implied, except as stated in the charter. The subscription by the county commissioners was without condition. No route had then been determined upon. The fact that the directors afterward located one route did not have the effect of a condition subsequent that the road should be built on that route, so far as the subscriber for stock was concerned; and the change to another location within the chartered limits was one the directors had a right to make, subject to approval by the railroad commissioners.

This was known to the voters, when they cast their ballots, and to the county commissioners when they subscribed for stock. If the vote or subscription had been upon a condition, the subscriber would not be held if the condition had not been performed. *Railroad* v. *Brewer*, 67 Maine, 295. But here there was no condition. In such case a change in the charter does not relieve the subscriber; *South Bay Meadow Dam Co.* v. *Gray*, 30 Maine, 547; nor does a change or extension in the route. *Agricultural Branch R. R.* v. *Winchester*, 13 Allen, 32; *Nugent* v *Supervisors*, 19 Wall. 242; *Cantillon* v. *Dubuque R.*, 78 Iowa, 56; *Bank* v. *Concord*, 50 Vt. 279; *Martin* v. *Railroad*, 8 Fla. 370, (73 Am. Dec. 720.)

A radical, fundamental change in the character of the original enterprise releases the subscriber for stock who does not consent to it; it does not have that effect if consented to. In this case, the county, through its county commissioners, have consented to the changed location, as shown by their re-subscription for stock. There being nothing in the vote of the county to the contrary, the county commissioners had authority to give consent. But we hold the change was not of that radical and fundamental character which would relieve a non-consenting stock subscriber. *Moesen* v. *Port Washington*, 37 Wis. 174.

It is claimed that the work done in grading before January 1st, 1896, was done before location of the line, which might be located elsewhere, and therefore it cannot be treated as work upon the road within chap. 91, of Special Laws of 1895. But it was evidently known from preliminary surveys where the line would be

at that point, and the actual location subsequently made coincides identically with the grading done. These facts must be regarded as a substantial compliance with the statute limitation of time within which the work of construction should be commenced. A great public enterprise like this, of manifest importance to Washington county specially, and the state generally, should not be thwarted or overthrown by the court upon technical and unimportant grounds. A substantial compliance with the requirements of the charter and the laws applicable is sufficient. Such is the doctrine of the courts.

<div align="right">*Bill dismissed, with costs.*</div>